21-MJ-1040

## AFFIDAVIT OF SPECIAL AGENT CRAIG R. HARVEY IN SUPPORT OF AN APPLICATION FOR CRIMINAL COMPLAINT

I, Special Agent Craig R. Harvey, depose and state as follows:

1.       I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since July 2018.   I am currently assigned to the Boston Field Office, North Shore Gang Task Force ("FBI Task Force").   The primary mission of the FBI Task Force is to identify, investigate, disrupt, and dismantle violent criminal organizations operating in cities north of Boston.   My responsibilities include the investigation of possible violations of federal law, including illegal possession/transfer of firearms, firearms trafficking, narcotics trafficking, and violent crimes involving firearms and narcotics trafficking.   I have received training and experience in various aspects of criminal law and procedure, including electronic and physical surveillance, interrogations, stops, searches, seizures, and arrests for a variety of criminal offenses.   Through my training, knowledge, and experience, I have become familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the use and trafficking of illegal firearms and narcotics, including persons involved in criminal organizations.   My investigations have included the use of surveillance techniques and the execution of search, seizure, and arrest warrants.

2.       This affidavit supports an application for criminal complaint charging DHAMARI JORDAN in a historical and ongoing drug trafficking conspiracy with others known and unknown to law enforcement, to distribute, manufacture, and possess with intent to distribute and manufacture fentanyl, cocaine and cocaine base.   Specifically, I make this affidavit in support of a criminal complaint charging DHAMARI JORDAN ("JORDAN") with Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, including Cocaine, Cocaine Base, and

1

Fentanyl, in violation of 21 U.S.C. §§ 841 and 846.

3.      The information contained in this affidavit is based on my personal observations and review of records and reports, my training and experience, and information obtained from other FBI and ATF agents, Massachusetts State Police Troopers, local police officers and witnesses. The dates and times in this affidavit are approximate.  This affidavit is submitted for the limited purpose of establishing probable cause for the issuance of the requested criminal complaint and arrest warrant and does not set forth all of my knowledge about this matter.

**PROBABLE CAUSE**

**I.      BACKGROUND OF DHAMARI JORDAN**

4.      I am familiar with DHAMARI JORDAN who has a date of birth of XX/XX/2001. JORDAN goes by the street-name "DMO" or his rap name "DMO CRASHOUT".  JORDAN has not been convicted of a crime as an adult, but has an open felony case, and has been thereby prohibited from possessing firearms since at least June of 2019.  JORDAN is currently on pretrial release for this open felony gun case.  According to his criminal record, this open felony case is Cambridge District Court Docket No. 1952CR000841, charging him with firearms offenses.  This open case involved JORDAN possessing a loaded 9mm firearm in his waistband, and he was arrested for this incident on June 6, 2019.  A photograph of JORDAN from the Massachusetts Registry of Motor Vehicles follows:



5.      JORDAN is also featured in numerous rap videos on YouTube over the past two years under his rap name "DMO" where he is depicted holding numerous firearms, brandishing weapons, and discussing the distribution of controlled substances. In one video entitled "Get Right", posted publicly on YouTube on March 19, 2020, JORDAN is depicted an apartment location where cocaine base is being manufactured at a stove by a woman. During the video JORDAN raps about making money by selling drugs, describes his willingness to commit violence against rivals, brandishes a firearm, and makes gang signs with his hands.  Lines of cocaine are also visible on a table in the video as well. Three still images from this music video follow:







6.     On January 8, 2020, Boston Police noticed a 2012 Infiniti M37 that matched a recent bulletin as being involved in a shots-fired incident a few days earlier.  The officers stopped the vehicle for what they observed to be excessive window tint, and JORDAN was identified to be the front passenger.  The driver of the car gave verbal consent to search the vehicle.  Officers located a black firearm in the trunk, after moving a spare tire.  The black firearm was identified to be a SCCY model CPX-2 9mm firearm, serial number 130861, with a loaded magazine containing 1 round of 9mm ammunition.  Officers noted that the trunk was accessible from the passenger compartment of the vehicle.  JORDAN was placed under arrest and during a search of his person, officers located 20 pills in the front pouch of his boxer shorts.  These pills were later analyzed at

the MSP Crime Lab and determined to contain heroin.  JORDAN later admitted to sufficient facts

for this case in state court and was placed on probation.

## II.    PURCHASES OF CONTROLLED SUBSTANCES FROM JORDAN

7.    This case results from a joint investigation by FBI, the Bureau of Alcohol Tobacco and

Firearms ("ATF"), and Massachusetts State Police in relation to drug distribution and violent gang

activity and shooting taking place in communities north of Boston.

8.    On December 3, 2020, a Trooper of the Massachusetts State Police ("MSP") operating in

an undercover capacity ("UC-1") observed pictures on Snapchat posted by DMO CRA$HOUT

advertising the sale of Percocet 30 mg pills and Adderall.  UC-1 then sent DMO CRA$HOUT a

Snapchat message inquiring about the cost, to which DMO CRA$HOUT responded "$20 a pill."

UC-1 then provided DMO CRA$HOUT a phone number used by another investigator acting in an

undercover capacity ("UC-2").  Approximately five minutes thereafter, a male believed to be

JORDAN contacted that number and spoke with UC-2 for approximately five minutes, during

which conversation JORDAN told UC-2 that the "Perc 30's" are "pure fentanyl pills" and

discussed price, type, and quantity of future narcotics transactions.

### A.    JANUARY 7, 2021 – PURCHASE OF 12 SUSPECTED FENTANYL PILLS

9.    On January 6, 2021, another undercover Trooper with MSP, UC-2, contacted JORDAN to

facilitate a transaction on January 7, 2021.  JORDAN informed UC-2 that he would sell UC-2

twelve "blues" for $200.  I know "blues" to be a commonly used term for fentanyl pills.  UC-2

communicated with JORDAN via a phone number ending in 0653.

10.    UC-2 communicated with JORDAN to confirm their meeting they had scheduled for that

day.  At approximately 2:11 PM, UC-2 informed JORDAN that he would soon be in Malden;

JORDAN then directed UC-2 to meet him at 520 Main Street.  JORDAN's Board of Probation

(BOP) lists his residential address of 520 Main Street, Apartment #1404, Malden.

11.     At approximately 2:31 PM, UC-2 communicated with JORDAN and informed him that he had arrived.  Approximately five minutes later, surveillance personnel observed a black male exit the front door of the apartment complex and enter the passenger seat of UC-2's vehicle.  Upon entering UC-2's vehicle, UC-2 and the male exchanged $200 for a plastic bag containing 12 blue pills.  UC-2 asked the male "Are these good bro?  Percs or fetty?"  The male replied "I dunno, what did he tell you they were."  At approximately 2:40 PM, surveilling personnel observed the male exit UC-2's vehicle and reenter the front door of the apartment complex.

12.     The suspected drugs were tested at the DEA laboratory and determined to contain fentanyl and weigh approximately 1.2 grams.

13.     On January 13, 2021, UC-2 identified a photograph of a specific individual I will refer to as EO, as the individual who delivered the twelve pressed fentanyl pills on January 7, 2021.

**B.     JANUARY 13, 2021 – PURCHASE OF 3.5 GRAMS OF CRACK COCAINE**

14.     On January 13, 2021, UC-2, acting in an undercover capacity, contacted JORDAN via the phone number 617-821-0653 and they discussed prices for the future purchase of crack cocaine. JORDAN ultimately informed UC-2 that he would sell him 3.5 grams of crack cocaine in exchange for $210.

15.     At approximately 1:13 PM, UC-2 sent JORDAN a text message stating "Imma grab ball…wher at."  At approximately 1:24PM, JORDAN replied "120 Salem St Malden ma."  I know the term "ball" to be a commonly used term for "8-ball," which is the equivalent to one-eighth of one ounce.  UC-2 communicated with JORDAN via the phone number ending in 0653.

16.     At approximately 1:40 PM, UC-2 called JORDAN and informed him he was outside of 120 Salem Street.  JORDAN stated that he was "going to send my uncle out, you will see him

soon." A few minutes later, surveilling agents observed a black male exit the front of 120 Salem Street and enter the front passenger seat of UC-2's unmarked vehicle. Upon entering UC-2's vehicle, the male handed UC-2 a plastic bag containing approximately 3.5 grams of white rock-like substance, and UC-2 handed the male $210. During the transaction, UC-2 asked the male what his name was; the male responded "KB." After approximately one minute, surveilling agents observed that individual exit UC-2's vehicle and reenter 120 Salem Street.

17.     The suspected drugs were tested at the DEA laboratory and determined to contain cocaine and weigh approximately 3.4 grams

### C.     JANUARY 20, 2021 – CONVERSATION REGARDING COOKING CRACK COCAINE

18.     On Monday January 18, 2021, at approximately 12:42 PM, UC-2 sent a text message to JORDAN via the phone number ending in 0653 with the "[Fire emoji] Bruh" to which JORDAN replied, "Huh." UC-2 was implying that the "crack" cocaine which he purchased from Jordan on January 13, 2021 was a high quality product.

19.     UC-2 then called JORDAN where they engaged in a phone call. During this call, UC-2 informed JORDAN how strong his product was, and about the cost of purchasing half an ounce (14 grams) to a full ounce (28 Grams) of "Crack" cocaine. After the call, JORDAN sent UC-2 a text message stating, "9." UC-2 responded by asking, "wat bout zip" to which JORDAN replied, "18, lmk straight grease." UC-2 replied, 'imma let u kno" to which JORDAN replied, "850 for da half actually."

20.     During this exchange, I believe JORDAN's text message of "9" referred to the price ($900) for half an ounce of "Crack" cocaine. UC-2 then inquired about the price of a "Zip" which is a common street term for an ounce. JORDAN replied stating, "18 lmk straight grease." I believe JORDAN was informing UC-2 that the price for one ounce of "crack" cocaine would be $1800

and the product he is attempting to distribute is a high quality product; JORDAN then dropped the price for one half ounce, charging him $850.

21.     JORDAN and UC-2 continued to text, and JORDAN stated "I got it if you need it some of the best fire locally broski (100 emoji)." UC-2 then asked, "Cn u do 16 for zip" which JORDAN replied, "Need 18 nbs cuz its already cheffed up, if u grab soft ill do 16 but ya gonna have to cheff ur it itself and u can make extras I don't kno if u kno how to cook tho urself."  During this exchange, JORDAN informed UC-2 that JORDAN had some of the highest quality product within Malden. UC-2 then asked Jordan if he would sell him one ounce of "Crack" cocaine for $1600.  JORDAN then stated he need $1800 because it is already synthesized from powdered cocaine to "Crack" cocaine, or cocaine base, form.  JORDAN then told UC-2 he would sell him one ounce of powdered cocaine for $1600 but UC-2 would have to "cheff" or "cook" the product himself to turn it into "Crack." JORDAN continued by telling UC-2 that if he cooked the powdered cocaine himself, he could synthesize the product enough that he would end up with more than 28 grams. JORDAN ended the conversation stating he was not sure if UC-2 knew how to "cook" powdered cocaine into a "crack" form.

##     D.     JANUARY 21, 2021 – PURCHASE OF 28 GRAMS OF CRACK COCAINE

22.     On Wednesday January, 20, 2021, UC-2 engaged in a text conversation with JORDAN utilizing the number ending 0653. At approximately 10:38 PM, UC-2 asked, "cn u grab zip", which I know to be slang for an ounce crack cocaine. The next day, on January 21, 2021, at approximately 6:42 AM, JORDAN responded, "Yea." At approximately 1:21 PM, UC-2 called JORDAN and JORDAN stated he was waiting on "His guy to come from Revere" and he would arrive around 3:00 PM.  During this operation, investigators were monitoring a live-feed video of the surveillance cameras installed inside of 120 Salem Street with consent of the property manager.

The security cameras capture common areas and hallways of the complex. Additionally, there are signs posted which state, "Warning, security cameras monitored by Malden Police."

23.     At approximately 4:20 PM, surveillance observed a white Dodge Charger bearing a Pennsylvania registration arrive and park next to 120 Salem Street. They observed a black male exit the Charger and walk towards the main entrance of 120 Salem Street. Officers observed it was idling with the running lights activated and a female in the front passenger seat. From live monitoring of the premises security system facilitated by the property's management company, investigators learned that a black male wearing a black sweatshirt with purple lettering on it had met up with the operator of the Charger inside the common area of 120 Salem Street. Once the two greeted each other, they began to walk towards the area of apartment #6. At that time, UC-2 called JORDAN inquiring of his status. JORDAN then informed UC-2 that his "Guy" was there and to drive to 120 Salem Street and park out front. Following the phone call, JORDAN sent UC-2 a text stating, "What car u in?"

24.     At approximately 4:28 PM, UC-2 arrived and parked in front of 120 Salem Street. At approximately 4:31 PM, JORDAN exited 120 Salem Street crossed the street and entered the front passenger seat of UC-2's vehicle. JORDAN removed a plastic bag containing one ounce of "crack" cocaine from his left sweatpants pocket and handed it to UC-2.  UC-2 then weighed the "crack" cocaine and handed JORDAN $1,700 of pre-recorded US currency. JORDAN then exited UC-2's vehicle and reentered 120 Salem Street.

25.     Still images from the recording, depicting JORDAN in UC-2's vehicle and holding the cocaine base follow:



26.     The suspected drugs were tested at the DEA laboratory and determined to contain cocaine base and weigh approximately 27.4 grams.

## **CONCLUSION**

27.     Based the foregoing, there is probable cause to believe that JORDAN, and other identified and unidentified individuals have violated 21 U.S.C. §§ 841, and 846, by conspiring to distribute fentanyl, cocaine and cocaine base and possessing those controlled substances with intent to distribute them.

        Signed electronically and sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on February 23, 2021.

                        */s Craig R. Harvey*
                        Craig R. Harvey
                        Special Agent
                        Federal Bureau of Investigation

Electronically subscribed and telephonically sworn to before me this 23rd day of February, 2021.

                        HON. DONALD L. CABELL
                        UNITED STATES MAGISTRATE JUDGE

